# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEFFREY SCUDDER,

           Plaintiff,

           v.

CENTRAL INTELLIGENCE AGENCY,

           Defendant.

Civil Action No. 12-807 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff Jeffrey Scudder seeks electronic copies of 419[1] *Studies in Intelligence*

("*SII*")[2] articles from the defendant, the Central Intelligence Agency ("CIA"), pursuant to the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. *See* Compl. ¶ 5, ECF No. 1; *see also*

Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. on Electronic Prod. of Requested Records ("Pl.'s Mem.")

at 2, ECF No. 9. Pending before the Court are five motions, none of which address the ultimate

issue of whether the documents requested by the plaintiff must be released under the FOIA: (1)

the parties' cross-motions for Summary Judgment on Electronic Production of Requested

Records, Pl.'s Mot. Summ. J. on Electronic Prod. of Requested Records ("Pl.'s Mot."), ECF No.

9; Def.'s Cross Mot. Summ. J. on Electronic Prod. of Records ("Def.'s Cross-Mot."), ECF No.

27; (2) the plaintiff's Motion for Discovery and/or an Evidentiary Hearing ("Pl.'s Discov.

Mot."), ECF No. 9; and (3) the parties' cross-motions for partial summary judgment regarding

---

[1] The plaintiff originally requested almost 2,000 articles, but subsequently decided to "forego [] pursuit, with a narrow exception, of those articles sought as part of [FOIA Request] F-2011-00450." Pl.'s Not. Part. Withdrawal of Parties' Cross-Summ. J. Mot. Pertaining to Def.'s Fee Waiver Denials at 1–2, ECF No. 35. This reduced the total of 1,987 articles requested by 1,568, leaving 419 in dispute. *See* Pl.'s Clarification Of His Not. Of Part. Withdrawal of Parties' Cross-Summ. J. Mots. Pertaining to Def.'s Fee Waiver Denial ("Pl.'s Clarification") at 1–2, ECF No. 39.
[2] *Studies in Intelligence* is a "journal for intelligence professionals" that is "produced internally by the [defendant's] Center for the Study of Intelligence." *See* Pl.'s Mot. Part. Summ. J. Regarding Def.'s Fee Waiver Denial ("Pl.'s Fee Waiver Mot.") Ex. 1 at 3 (April 30, 2013 Letter from Pl.'s Counsel to Def.), ECF No. 22-1.

the defendant's fee waiver denial, Pl's Mot. Part. Summ. J. Re: Def.'s Fee Waiver Denial ("Pl.'s Fee Waiver Mot."), ECF No. 22; Def.'s Cross Mot. Part. Summ. J. Re: Fee Waiver Denial ("Def.'s Fee Waiver Cross-Mot."), ECF No. 31. For the reasons set forth below, the four cross-motions for summary judgment are denied and the plaintiff's motion for discovery is granted.

## I.    BACKGROUND

The instant dispute centers on whether the defendant must provide records in an electronic format, as requested by the plaintiff, pursuant to 5 U.S.C. § 552(a)(3)(B). The defendant's position is that it "does not have the capability or the capacity to readily produce records requested under the FOIA, the Privacy Act, or the Mandatory Declassification Review program in an unclassified electronic format." Decl. of Martha T. Lutz, Chief, Litigation Support Unit, CIA (Jul. 17, 2013), ("1st Lutz Decl.") ¶ 5, ECF No. 14-3. In essence, the defendant argues that it is *de facto* exempt from the requirements of 5 U.S.C. § 552(a)(3)(B) to provide records in the format sought by the requester if the requester seeks records electronically since, due to the defendant's security procedures, the production of records in such a format "would be prohibitively time consuming and costly." *See id.* Instead, the method the defendant proposes to fulfill the plaintiff's FOIA request is to release over 19,000 pages of paper printouts, even though this very method was singled out by Congress as an example of an archaic system out of step with the times nearly twenty years ago with passage of the Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, 110 Stat. 3048 (codified at 5 U.S.C. § 552 (Supp. II 1996) ("E-FOIA Amendments"). *See* 142 Cong. Rec. H10450 (Sept. 17, 1996) (statement of Rep. Tate) ("[M]any agencies have not responded to the needs of a public that has already moved into the information age—continuing to focus on answering with volumes of paper rather than with CD-ROM's [sic] or computer disks."); *see also* 142 Cong. Rec. H10449

(daily ed. Sept. 17, 1996) (statement of Rep. Horn referring to Rep. Tate as "prime author" of E-FOIA Amendments in House of Representatives).

The plaintiff, as a long time employee of the defendant with over twenty-three years of experience in the intelligence community, disputes the defendant's assertions and indicates that he has substantial personal knowledge of the inner workings, procedures, and technical capabilities of the defendant. *See* Part I.A. *infra*. Based upon this purported knowledge, the plaintiff has challenged a myriad of factual allegations presented by the defendant and the defendant, in turn, has made efforts to discount, dismiss, or refute factual assertions made by the plaintiff. Out of this miasma of disputed facts, both parties, nevertheless, assert that summary judgment may be appropriately granted in either the plaintiff or the defendant's favor. Set out below is a summary, first, of the plaintiff's attested experience and personal knowledge, which prompted him to make the FOIA requests at issue in this litigation, and second, the procedural history of the instant matter.

### A. The Plaintiff's Knowledge And Experience

The plaintiff does not detail the precise dates when he worked as an employee of the defendant, but indicates that after he began his career with the defendant at an indeterminate date in the past, he was selected for the defendant's "Career Trainee program," which the plaintiff describes as a one year program that serves as the defendant's "version of Officer Candidate School." Decl. of Jeffrey Scudder (Aug 25, 2013) ("2d Scudder Decl.") ¶ 8, ECF No. 21-1. As part of the program, the plaintiff attests that he "spent time with every office in the Directorate" of Administration, "followed by positions in the office of the Deputy Director of Administration, field assignments as a support officer, and finally as a management generalist officer in the Directorate [of Administration] supporting management as needed anywhere." *Id.* The plaintiff

notes that one of his "last assignments involved being asked by the Director of Support to sit on a working group to review efficiency in the Directorate [of Administration] and advise on how to develop, deploy, and utilize better business metrics to improve operations." *Id.* The plaintiff asserts that, from 2004 through 2006, he worked as the "project manager for the FBI's Investigative Data Warehouse," which was "one of the largest and most successful of the Bureau's post-9/11 efforts and was touted as one of its major successes." *See id.* ¶¶ 4–5. In 2006, the plaintiff states that he returned to work for the defendant and "was immediately put in charge of the Architecture and System Engineering staff supporting the National Clandestine Service ("NCS")." *Id.* ¶ 5. From 2007 through 2009, the plaintiff states that he worked "in Information Security for the Counter Intelligence Center . . . [and] spent two years working in Information Management Systems ("IMS")" for the defendant. Decl. of Jeffrey Scudder (May 22, 2013) ("1st Scudder Decl.") ¶ 2, ECF No. 9-1. In 2012, the plaintiff "received permission from [the defendant] to engage in outside activities/employment and [he] was hired by the largest credit union in the world to manage security threats and remediation in their [sic] IT environment, which includes managing an $85 million dollar data warehouse project." 2d Scudder Decl. ¶ 5.

The plaintiff claims that his work in the defendant's IMS component gave him "a deep knowledge of the CIA's Automated Declassification and Release Environment ("CADRE") system, which is what the [defendant's] FOIA office uses." 1st Scudder Decl. ¶ 2. In addition to being an end user of the CADRE system, the plaintiff "worked with the CACI system engineers who designed CADRE and [he] spent considerable time testing its capabilities." *Id.* ¶ 3. While working at IMS, the plaintiff "received two Exceptional Performance Awards and a Meritorious Unit Citation." *Id.*

In one of the multiple information technology positions he held with the defendant, the plaintiff worked for the defendant's Historic Collections Division ("HCD"), a division of IMS, which "review[s] and manually redact[s] classified material for releases to the public." *Id.* ¶ 7. It was while employed in this capacity that the plaintiff discovered "three document projects that had been ready for release to the public for a decade but for some reason had never been" released, specifically, *SII* articles. *See id.* The plaintiff states he began his own investigation as to why these articles, totaling over 10,000 pages of records, *id.* ¶ 9, were never released and eventually "learned an interesting story," *id.* ¶ 7. The plaintiff alleges that an internal dispute between different departments within the defendant prevented the release of these documents to the National Archives and Records Administration ("NARA"). *See id.* ¶¶ 8–9.

According to the plaintiff, "many years" before he filed the FOIA requests in dispute, "the director of [the defendant's] Center for the Study of Intelligence ("CSI") forwarded a number of Studies in Intelligence articles to IMS for review prior to release." *Id.* ¶ 8. In the face of apparent inaction, the plaintiff asserts that "the CSI Director approved the release of the articles to [NARA] on his own authority." *Id.* The plaintiff alleges that subsequent to this decision, "IMS leadership . . . went to CIO/Legal to ascertain whether the documents could be pulled back from NARA, which the [defendant] is authorized to do but has rarely[,] if ever[,] done." *Id.* The plaintiff states that IMS' purported rationale was that "the articles contained classified material but CIO/Legal only noted that the [*SII*] articles should contain a disclaimer stating that they were not government work product but personal opinion pieces." *Id.* ¶ 9.

After receiving this legal advice, which apparently lent support to the decision of the CSI Director to release the *SII* articles to NARA, the plaintiff alleges that "an internal office 'feud' developed and IMS refused to release any more material from [*SII*] articles." *Id.* The plaintiff

was "taken aback by this [decision,] as the American taxpayers had already paid for all the work to scan, redact, and review over 10,000 pages of material and this was exactly the type of information HCD was suppose[d] to release to the public." *Id.* In the course of his investigation, the plaintiff also alleges that he "discovered that . . . CSI paid to have every published [*SII*] article re-scanned into PDF files that allowed word searching." *Id.* ¶ 10. The plaintiff asserts that he attempted to convince the defendant "to input the PDF files into CADRE but [he] was told this was not possible." *Id.* On his own initiative, and after working with the "IMS scanning team," the plaintiff asserts that he was able "to demonstrate that PDF files can be automatically turned into TIFF images and incorporated directly into CADRE." *Id.* The plaintiff's "goal was to use the new PDF images the taxpayers already paid for to create and release the files to the public." *Id.*

The plaintiff's efforts to convince IMS to release the documents failed, which led the plaintiff to try to "re-release the previously processed [*SSI*] articles using the new PDF versions." *Id.* ¶ 11. The plaintiff states that he was prevented from doing this as well and was told by "one of the senior managers in IMS [to] 'just make this whole thing go away.'" *Id.* Out of a belief that "IMS was violating both the principle and the letter of the law" the plaintiff "decided to force [the defendant's] hand by submitting FOIA requests for these articles" after he "transferred to the Counter Intelligence Center," a transfer that appears to have occurred sometime in 2010. *See id.*

### B.    The Instant FOIA Requests

The plaintiff filed three undated FOIA requests with the defendant. *See* Pl.'s Mot. Ex. A (undated FOIA requests) at 2–4, ECF No. 9-2; *see also* Def.'s Fees Cross-Mot. Ex. A (same) at 2–4, ECF No. 30-3. Each request described the requested records by noting that "[i]n the past

three years the Agency made PDF copies of all SII articles ever written. These are excellent quality copies and in electric [sic] PDF form can be searched." Pl.'s Mot. Ex. A at 2–4. The plaintiff's request, however, only sought "[e]lectronic copies of [specified] Studies in Intelligence (SII) articles," without expressly requesting—though implying—the desire to receive the requested articles in PDF form. *Id.* The three sets of requested documents differed in that one request sought "133 articles [that] have either been released in sanitized versions or are somewhere in the redaction and release process," *id.* at 2; another sought "282 articles [that] have never been released;" *id.* at 3; and the third sought "1,572 articles . . . [that] have either been released to NARA, listed on CIA.gov, published in an unclassified edition of SII, or a combination of the three," *id.* at 4.[3] For each request, the plaintiff specified where on the defendant's servers the documents could be located and offered "to help in locating requested documents." *Id.* at 2–4. In total, the plaintiff's requests sought 1,987[4] articles, which the defendant asserts total "nearly 19,000 pages." *See id.*; 1st Lutz Decl. ¶ 13.

After receiving no response from the defendant by June, 2011, the plaintiff sent the defendant a request for a status report, Pl.'s Mot. Ex. B (correspondence dated June 27, 2011 from plaintiff to defendant) at 2–3, ECF No. 9-3, to which the defendant responded acknowledging receipt of the requests and notifying the plaintiff of the requests' reference numbers, *see* Pl.'s Mot. Ex. C (correspondence dated July 27, 2011 from defendant to plaintiff) at 2, ECF No. 9-4.

The plaintiff, now represented by counsel, sought "an estimated date on which the [defendant] will complete action" on the plaintiff's request by letter and voicemail in late 2011

---

[3] This last request has now been largely abandoned, with the exception of four articles for which the defendant is withholding the title. *See* Pl.'s Clarification at 1.

[4] The defendant's declarant states the plaintiff requested "1,927 specific *Studies in Intelligence* articles." 1st Lutz Decl. ¶ 4. The plaintiff's requests seek "133 articles," Pl.'s Mot. Ex. A. at 2; "282 articles," *id.* at 3; and "1,572 articles," *id.* at 4, the sum of which equals 1,987 articles. Neither party attempts to explain this discrepancy.

and early 2012. *See* Pl.'s Mot. Ex. 2 (Correspondence dated January 25, 2012 from plaintiff's counsel to defendant) at 2, ECF No. 9-6. Since the plaintiff did not consider the defendant's response satisfactory, *see id.* at 3, the plaintiff filed the instant suit on May 16, 2012.[5]

Shortly after the instant suit was filed,[6] the defendant notified the plaintiff by letter that "although [the plaintiff] requested these records electronically, we have determined that [the] records are not readily reproducible in such a format." Pl.'s Mot. Ex. D (correspondence dated April 12, 2013 from defendant to plaintiff's counsel) at 3, ECF No. 9-5. The defendant offered no explanation for this determination. *See id.* Moreover, the defendant asserted that, even if it were possible to provide the requested records in electronic format, "due to the nature of the duplication process, the above fees [for paper duplication] would still apply and additional costs for the CDs [on which the electronic files would be burned] would be assessed." *Id.*

### C.     The Pending Motions

The pending motions refer to two distinct disputes, one of which has been substantially resolved by the parties. The first set of motions, which consists of the parties' cross-motions for summary judgment and the plaintiff's motion for discovery, concerns the defendant's assertion that the records the plaintiff requests "are not readily reproducible" in an electronic format and need not be produced in such a format under 5 U.S.C. § 552(a)(3)(B). *See generally* Pl.'s Mot; Pl.'s Discov. Mot.; Def.'s Cross-Mot. The reasons proffered by the defendant for determining that the requested records are not "readily reproducible" boil down to the assertion that the defendant has neither "the capability or the capacity to readily produce records" responsive to FOIA requests in any electronic format. 1st Lutz Decl. ¶ 5. The defendant's two major

---

[5] For unknown reasons, the defendant failed to Answer until March 14, 2013. *See generally* Answer, ECF No. 5.
[6] The plaintiff notes that he filed a Notice of Related Case on February 7, 2013, identifying *National Security Counselors v. CIA*, No. 11-443, as involving common issues of fact and "involving some of the same records." Pl.'s Mem. at 2 n.2. The instant matter was reassigned, on July 1, 2013, to the undersigned Judge, before whom *National Security Counselors* remains pending.

objections, based on technical infeasibility and an undue burden on the defendant, are discussed in greater detail in Part III.C, *infra*.

The second set of motions, consisting of the parties' partial cross-motions for summary judgment, refers to the plaintiff's application for a fee waiver and the defendant's subsequent administrative denial of such a waiver. *See generally* Pl.'s Fees Mot.; Def.'s Fees Cross-Mot. As part of his motion, the plaintiff challenges the defendant's assertion that, if no fee waiver were granted and the defendant were required to produce records in an electronic format to the plaintiff, the plaintiff would be required to pay *more* in fees for electronic copies of the records than for paper copies. *See* Pl.'s Mem. Supp. Pl.'s Fees Mot. ("Pl.'s Fees Mem.") at 16–18 (emphasis supplied). Prior to the completion of briefing on the second set of motions, the plaintiff filed a notice with the Court stating that he had agreed to "forgo pursuit, with a narrow exception, of those articles" that were released by the defendant to NARA in the 1990s. *See* Pl.'s Not. Part. Withdrawal of Parties' Cross-Summ. J. Mots. at 1–2, ECF No. 35. Specifically, the plaintiff indicated his withdrawal of his request for production of the articles sought under FOIA request F-2011-00450, filed in this matter as Pl.'s Mot. Ex. A at 4, with the exception of "less than six" articles the defendant is withholding. *Id.* at 2 n.1. With the significant narrowing of the documents sought by the plaintiff, the defendant agreed to accept a substantially smaller sum of money than originally quoted by the defendant in order "to commence processing/copying" the requested documents. *Id.* at 2. As the plaintiff clarified in response to an order from the Court, *see* Minute Order (Feb. 21, 2014), the plaintiff's withdrawal of the vast majority of FOIA Request No. F-2011-00450 reduced the number of articles in dispute to 419. Pl.'s Clarification Of His Not. Of Part. Withdrawal of Parties' Cross-Summ. J. Mots. Pertaining to Def.'s Fee Waiver Denial ("Pl.'s Clarification") at 2, ECF No. 39.

The remaining live issue from the parties' second set of motions, therefore, is what cost, if any, the defendant may charge the plaintiff for any documents produced electronically. *See id.* The defendant claims that, in order to produce the records requested electronically, "Agency personnel would be required to 'print a paper copy of the documents from [CADRE]" and then scan the records "into the Agency's computer system in order to create an unclassified electronic version of the document." Def.'s Surreply Pl.'s Reply Def.'s Opp'n Pl.'s Fees Mot. ("Def.'s Fees Surreply") at 3–4, ECF No. 38. In other words, the defendant avers that if it were ordered to honor the plaintiff's request, it would have to print the existing electronic documents to paper and then rescan them into electronic documents so that they may be reproduced and released on removable media. *See* Part III.C, *infra*. As a result of this process, the defendant asserts that the cost of electronic production to the plaintiff would be higher than that of producing the records in paper format, since the defendant would incur all of the costs associated with the paper production as well as the additional costs of re-scanning the printed responsive records, and the cost of any removable media provided to the plaintiff. *See* Def.'s Fees Surreply at 3–4.

The plaintiff disputes the reasonableness of this fee, noting that neither the plaintiff nor the plaintiff's counsel are aware "of even one other federal agency who takes the same position as [the defendant] with respect to the production of electronic records." Pl.'s Reply Def.'s Opp'n Pl.'s Fees Mot. ("Pl.'s Fees Reply") at 3, ECF No. 36. Indeed, the plaintiff asserts that other government agencies "simply charge[], if anything, a fee for the cost of the CD-ROM (usually $10 - $15) and never seek[] to apply the same reproduction costs as if it were printing paper copies." *Id.* Finally, the plaintiff accuses the defendant of attempting to "frustrate [the] core purpose [of the FOIA] through administrative gimmicks designed to impose unreasonable financial burdens upon requesters." *Id.* at 4.

Resolution of this cost issue may be rendered moot, depending on whether the defendant prevails on the first set of cross-motions. Specifically, if the defendant is correct that the plaintiff's request for electronic production of the requested records need not be honored, then the second set of motions is moot because no electronic production of records would be required. Since the Court denies summary judgment to both parties on the first set of cross-motions, the second set of cross-motions is denied without prejudice.[7]

## II. LEGAL STANDARD

### A. FOIA

The FOIA requires federal agencies to release all non-exempt agency records responsive to a request for production. *See* 5 U.S.C. § 552(a)(3)(A). It also requires agencies to "provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B). This requirement is bolstered by the additional direction that "[e]ach agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this [sub]section." *Id.* An agency's "determination as to reproducibility . . . must be accorded 'substantial weight' by the reviewing court." *Sample v. U.S. Bureau of Prisons*, 466 F.3d 1086, 1088 (D.C. Cir. 2006) (quoting 5 U.S.C. § 552(a)(4)(B)).

Upon exhaustion of administrative remedies, a FOIA requester may file a civil action challenging an agency's response to its request. *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004). Once such an action is filed, the agency generally has the

---

[7] Consequently, this Memorandum Opinion does not address the arguments set forth by the parties in reference to the duplication cost dispute, even though the declarations and memoranda in support and opposition thereto have been reviewed in considering the motions for summary judgment regarding the electronic production of records pursuant to 5 U.S.C. § 552(a)(3)(B).

burden of demonstrating that its response to the plaintiff's FOIA request was appropriate.  *See Wilbur*, 355 F.3d at 678.

## B.     Summary Judgment

Although it is typically appropriate to resolve FOIA cases on summary judgment, *see Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011) ("the vast majority of FOIA cases can be resolved on summary judgment"), a party seeking summary judgment in a FOIA case still "must show, viewing the facts in the light most favorable to the [non-moving party] that there is no genuine issue of material fact," *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994); *see also Moayedi v. U.S. Customs and Border Prot.*, 510 F. Supp. 2d 73, 78 (D.D.C. 2007).  To defeat summary judgment, the non-moving party must present specific facts "'such that a reasonable jury could return a verdict for the nonmoving party.'"  *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); s*ee also* Fed. R. Civ. P. 56(c)(1).  When, at the summary judgment stage, the parties present a genuine dispute about the facts, the court must draw all justifiable inferences in favor of the non-moving party and accept the non-moving party's evidence as true.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson*, 477 U.S. at 255.  For a factual dispute to be "genuine," the non-moving party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, "must do more than simply show that there is some metaphysical doubt as to the material facts," *Scott*, 550 U.S. at 380, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* Fed. R. Civ. P. 56(e).  "[T]hese general standards under rule 56 apply

with equal force in the FOIA context." *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

The D.C. Circuit has made clear that "'[s]ummary judgment may be granted on the basis of agency affidavits'" in FOIA cases, when those affidavits "'contain reasonable specificity of detail rather than merely conclusory statements,'" and when "'they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006) and *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)).

## III.    DISCUSSION

The D.C. Circuit has observed that resolution of a FOIA case on summary judgment "is not always" proper. *Brayton*, 641 F.3d at 527. Indeed, the D.C. Circuit has, although rarely, found summary judgment precluded on the basis of competing affidavits in the FOIA context. *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18–19 (D.C. Cir. 1999); *Wash. Post. Co.*, 865 F.2d at 325–26. Resolving issues of material fact in FOIA cases has, for example, required a bench trial to determine the propriety of exempting certain documents from release under the FOIA, *see In Defense of Animals v. USDA*, 656 F. Supp. 2d 68, 70 (D.D.C. 2009), or an evidentiary hearing, *see Morrison-Knudson Co. v. U.S. Dep't of Army*, 595 F. Supp. 352, 353 (D.D.C. 1984). Consequently, the Court will first discuss what constitutes a "material fact in dispute" under Federal Rule of Civil Procedure 56 in the FOIA context. Next, the parties' legal arguments as to the correct interpretation of 5 U.S.C. § 552(a)(3)(B) will be reviewed before the Court turns to a discussion of why the disputes in this

matter pertain to "material facts." Finally, the potential mechanisms available to resolve the instant material factual disputes will be examined.

## A.    "Material Facts" In FOIA Cases

The cases in which courts have discussed disputes over factual information in FOIA cases that are sufficient under Rule 56 to prevent summary judgment have primarily dealt with the propriety of claimed exemptions. For instance, in *Washington Post Company*, the D.C. Circuit was presented with a dispute over the correct application of the FOIA's Exemption 4, which exempts from public disclosure "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4); 865 F.2d at 324. The parties in that case provided competing affidavits about "whether public disclosure would cause individuals to so narrowly construe the requests for information" in the federal form at issue "that the government's information-gathering ability would be seriously impaired." 865 F.2d at 325. The D.C. Circuit criticized the parties for offering affidavits that did little more than state in conclusory fashion that the party's position was correct. *See id.* n. 7 ("[T]he only pertinent change in the record . . . is that [the government witness'] original conclusory affidavit has been joined by four equally conclusory affidavits. In effect, we asked the government [on a previous appeal in the same case] to change the station, and they responded by turning up the volume." (internal quotation marks and citations omitted)); *id.* at 326 (describing plaintiff's affidavits as "similarly terse"). The D.C. Circuit found that "[w]hile the district court may of course ultimately determine that the [plaintiff's] authorities are less believable than the [defendants'], it is impermissible to conclude at this stage that *no* reasonable factfinder could be persuaded by the plaintiff's evidence." *Id.* at 326 (emphasis in original). Consequently, the D.C. Circuit vacated

the lower court's summary judgment order and remanded the case for further fact finding. *Id.* at 328.

In reaching this conclusion, the D.C. Circuit relied upon its previous finding in *Sears, Roebuck and Co. v. General Services Admin.*, 553 F.2d 1378, 1382 (D.C. Cir. 1977), which warned that "[w]here there is a conflict in the affidavits as to what adverse consequences will flow from the revelation of the facts contained in the documents sought to be disclosed, then it appears that there is indeed a conflict regarding very material facts which calls for some type of adversary procedure." *Wash. Post. Co.*, 865 F.2d at 326 (quoting *Sears, Roebuck and Co.*, 553 F.2d at 1382). The D.C. Circuit further observed that "'factual' issues that involve predictive facts almost always require a court to survey the available evidence, to credit certain pieces of evidence above others, and to draw cumulative inferences until it reaches a judgmental conclusion." *Id.* Finally, the court found that where "the judge must pick and choose between competing experts' affidavits as to the effect of disclosure," then "it is clear that there is a genuinely controverted factual issue in the case which is not ripe for disposition by *summary judgment*." *Id.* (emphasis in original).

The D.C. Circuit revisited the issue of disputed facts regarding the application of Exemption 4 a decade after *Washington Post Co.* in *Niagara Mohawk Power Corp.* and, once again, found summary judgment improvidently granted by the district court in the face of contradictory affidavits, and remanded the case for further fact finding. 169 F.3d at 18, 21. The court described affidavits consisting of "speculative opinion" and a "terse and self-serving statement" as "not enough to establish the requisite risk of impairment" to label a record confidential under Exemption 4. *Id.* at 18. In *Niagara*, the D.C. Circuit singled out an affidavit from the plaintiff that "flatly dispute[d] the [government's] assertions," stating that the affidavit

was enough to "put[] in dispute whether there is a likelihood of substantial competition" such that the application of Exemption 4 was warranted. *Id.* at 18–19. The D.C. Circuit held that "each legally sound theory offered by [the government was] plagued by factual disputes," thus making "summary judgment . . . improper." *Id.* at 19; *see also In Defense of Animals*, 656 F. Supp. 2d at 71 (finding after *in camera* review that "disputed material fact" existed "as to whether disclosure of document withheld under FOIA Exemption 4 would cause substantial competitive harm").[8]

*Washington Post Co.*, *Niagara Mohawk Power Corp.*, and *In Defense of Animals* involved disputes over the proper application of the FOIA's Exemption 4, but certain rules may be gleaned as to what constitutes a "disputed material fact" more generally in the FOIA context. If the court is presented with affidavits from opposing parties that contradict each other "over the critical factual issue in th[e] case," summary judgment is inappropriate. *Wash Post Co.*, 865 F.2d at 325. Although "mere allegations" are insufficient to raise a genuine issue of material fact, *Veitch*, 471 F.3d at 134, where, as here, an affidavit is predicated on personal knowledge by the non-moving party that "flatly disputes the assertions" in the moving party's affidavit can be sufficient to raise an issue of material fact. *Niagara Mohawk Power Corp.*, 169 F.3d at 18. Finally, particularly when expert testimony would substantially aid the court in its decision-making, an adversary proceeding including such experts is appropriate. *See In Defense of Animals*, 656 F. Supp. 2d at 71; *see also Brayton*, 641 F.3d at 527 (citing *In Defense of Animals*

---

[8] The D.C. Circuit has since reaffirmed that there will be times when, despite the general amenability of FOIA cases to resolution on summary judgment, such a resolution is inappropriate. *See Brayton*, 641 F.3d at 527–28. In *Brayton*, the D.C. Circuit noted that such cases "are rare," but found that some FOIA cases would turn on "disputed issues of material fact" and the Circuit's doctrine on awarding attorneys' fees in FOIA cases must therefore take such possibilities into account. *Id.*

with approval for proposition that not all FOIA cases can be resolved without evidentiary findings).

The process of determining the applicability of Exemption 4 to withhold a responsive document shares one important similarity with determining whether an agency must disclose documents in an electronic format under 5 U.S.C. § 552(a)(3)(B): namely, both inquiries trigger a fact-based analysis. Exemption 4 exempts documents that contain "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Consequently, application of Exemption 4 often involves a determination as to whether the documents at issue contain "commercial or financial information" that is "privileged or confidential." *Id.* Determining whether a document is "confidential," while not requiring a court to engage in "a sophisticated economic analysis," typically turns on a fact-specific inquiry regarding whether the release of such information would "cause substantial harm to the competitive position of the person from whom the information was obtained." *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290-91 (D.C. Cir. 1983). Resolution of disputed facts underlying that analysis may be required, since "[c]onclusory and generalized allegations of substantial competitive harms, of course, are unacceptable and cannot support an agency's decision to withhold requested documents." *Id.* at 1291. Indeed, the contested nature of that very question led to the FOIA trial in *In Defense of Animals*. *See* 656 F. Supp. 2d at 71. Thus, while FOIA cases generally turn on application of law to undisputed material facts set out in agency affidavits, *see Brayton*, 641 F.3d at 527, courts may occasionally confront contested questions of fact that must be answered first. The meaning of 5 U.S.C. § 552(a)(3)(B) and its key phrase of "readily reproducible" sets the parameters for such a factual inquiry.

### B. The Meaning Of "Readily Reproducible"

Relatively few cases discuss the application of the FOIA's "readily reproducible" requirement, 5 U.S.C. § 552(a)(3)(B), which was enacted as part of the E-FOIA Amendments. *See Sample*, 466 F.3d at 1088. The leading case in this Circuit, *Sample v. Bureau of Prisons*, indicates that the central question to be determined in any dispute under this subsection is whether the documents in question are "readily reproducible" in the format sought by the requester. *See id.*; *see also TPS, Inc. v. U.S. Dep't of Defense*, 330 F.3d 1191, 1196 (9th Cir. 2003) (holding "relevant inquiry is whether, in general, the format is one that is 'readily reproducible' by the agency"); *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Educ.*, 905 F. Supp. 2d 161, 171 (D.D.C. 2012) (same); *Landmark Legal Found. v. EPA* ("*Landmark*"), 272 F. Supp. 2d 59, 63 (D.D.C. 2003) (same); *Carlson v. U.S. Postal Serv.*, No. C-02-5471, 2005 WL 756573, at *7 (N.D. Cal. Mar. 31, 2005) (same). As noted, similarly to the determination of whether the release of challenged documents will result in competitive harm under Exemption 4, whether a document is "readily reproducible" in a specified format is a fact-based determination. *See TPS, Inc.*, 330 F.3d at 1196; *LaRoche v. SEC*, 289 Fed. App'x 231, 231 (9th Cir. 2008) (affirming lower court's grant of summary judgment using clearly erroneous standard since finding that records were "readily reproducible" was a "decision [that] turns mainly on its findings of fact" (quoting *Lion Raisins Inc. v. USDA*, 354 F.3d 1072, 1078 (9th Cir. 2004)).

The parties to the instant matter agree on this point regarding the fact-based nature of the "readily reproducible" inquiry, but simply discount or reject outright the evidence presented by the other side about whether this FOIA requirement is met in this case. *See* Pl.'s Mem. at 6 (stating determination as to whether "agency can 'readily reproduce' a record in [a] particular

format . . . is one of fact, not law"); *id.* at 7 ("The crucial question in this case is whether, as a factual matter, [the defendant] can readily reproduce responsive records in an electronic format."); Def.'s Reply Pl.'s Opp'n Def.'s Cross-Mot ("Def.'s Reply") at 6–7, ECF No. 29 (challenging factual bases of plaintiff's contentions and stating, on the basis of those factual challenges, plaintiff's declarations "should be accorded no weight . . . and are insufficient to create a genuine issue of material fact"). *TPS, Inc.* is particularly instructive on how the parties' factual dispute should be resolved, since that case, as here, involved a dispute over the burden the release of documents in a requested electronic format would place on the agency in question. *See TPS, Inc.*, 330 F.3d at 1196.

In *TPS, Inc.*, a government contractor "sought the transmission of two files in 'zipped' format" from a Defense Department unit. *Id.* at 1193. The agency refused, stating that, under agency regulations, "readily reproducible" formats were those provided under a "business as usual" approach, and the plaintiff's request did not fall into "business as usual." *Id.* The agency supported its contention with a declaration from an agency analyst "claim[ing] that [the plaintiff's] request was 'unique'" and, consequently, the requested documents were not "readily reproducible" in the course of normal business. *Id.*

The plaintiff in *TPS, Inc.*, similarly to the plaintiff in the instant matter, was an industry insider, which had done substantial work with the agency in question and had previously received files from the agency in the requested "zipped" format, pursuant to a federal contract. *See id.* at 1194. The plaintiff submitted multiple affidavits to that effect, in direct conflict with those provided by the government. *Id.* at 1193–94. The Ninth Circuit found summary judgment was not appropriate because it was "impossible to resolve as a matter of law . . . [w]hether the [agency] in fact does provide zipped files as a 'normal business as usual approach.'" *Id.* at 1196.

The *TPS, Inc.* court noted that the plaintiff's declarations "highlight[ed] the factual issue: whether, as [the plaintiff's] declarations indicate, zipped files are part of the [agency's] usual mode of computerized transmission, or whether, as the government argues, zipped files are not produced in the normal course of business and are burdensome to create." *Id.* The Ninth Circuit held that the plaintiff's "declaration was sufficient to raise a factual issue regarding the [agency's] ability to transmit zipped files and its practice of regularly providing such files" and that this declaration "raised a factual question that cannot be resolved in summary judgment." *Id.* at 1196–97.

The defendant's attempt to distinguish *TPS, Inc.* is unavailing. Although the defendant is correct that the "business as usual" regulation at issue in *TPS, Inc.* is not applicable here, *see* Def.'s Mem. Supp. Cross-Mot. Summ. J. ("Def.'s Mem.") at 16, ECF No. 14, the defendant's point misses the principle thrust of the Ninth Circuit's opinion. The *TPS, Inc.* court held that "[w]hen an agency already creates or converts documents in a certain format . . . requiring that it provide documents in that format to others does not impose an unnecessarily harsh burden, absent specific, compelling evidence as to significant interference or burden." 330 F.3d at 1195. The situation described by the *TPS, Inc.* court is precisely the situation described in the instant matter: the plaintiff alleges that the requested records already exist and are maintained in the exact format requested by the plaintiff and that the defendant has provided such records, in such a format, to others. *See* Part III.B.2 *infra*. Despite the defendant's claims of incapability and incapacity, the defendant has not established through "specific, compelling evidence" that complying with the plaintiff's request would constitute "significant interference or burden," in the face of the plaintiff's contrary factual assertions, which are predicated on deep personal knowledge. *TPS, Inc.*, 330 F.3d at 1195; *see* Part III.B.2, *infra*.

Before turning to the specific factual disputes raised by the parties, the Court first addresses the parties' differing views of the legal requirement on the defendant to produce records in a requested format if those records are "reasonably reproducible" in that format, since the proper construction of the FOIA subsection at issue will inform the framing of any material factual disputes.

### 1.  *"Readily Reproducible" Is Not Synonymous With "Technically Feasible"*

Relying heavily on *Sample*, the plaintiff contends that "'readily reproducible' simply refers to an agency's technical capability to create the records in a particular format." Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Summ. J. ("Pl.'s Reply") at 3, ECF No. 21 (quoting *Sample*, 466 F.3d at 1088)). Based on this construction of the FOIA subsection at issue, the plaintiff argues that this factual question is "black and white." Pl.'s Mem. at 12. The plaintiff, however, reads too much into a single line of the D.C. Circuit's opinion.

In *Sample,* the D.C. Circuit rejected an agency argument "that providing the documents [requested] in paper format satisfied its obligations under FOIA because [the plaintiff, a prisoner who requested records in an electronic format], pursuant to [the defendant's] security regulations, could not *receive* the records in electronic format." 466 F.3d at 1088 (emphasis in original). There was no dispute in *Sample* as to whether the records were "readily reproducible" in the requested electronic format or whether production of the requested records electronically would be unduly burdensome, since the agency offered to produce them in electronic format to a non-incarcerated "designee." *Id*. Rather, the issue was whether the unique characteristics of the requester somehow absolved the agency from complying with the FOIA requirement to produce the records electronically as requested. *See id.* In this context, the D.C. Circuit made the statement, on which the plaintiff relies, that "[u]nder any reading of the statute, however, 'readily

reproducible' simply refers to an agency's technical capability to create the records in a particular format." *See* Pl.'s Mem. at 5 (quoting *Sample*, 466 F.3d at 1088). The plaintiff omits the court's critical gloss for the quoted statement that follows in the next sentence: "[n]o case construing the language focuses on the characteristics of the requester." *Sample*, 466 F.3d at 1088. This next sentence demonstrates that the quoted line was not meant to provide a definition of "readily reproducible," as the plaintiff would have it, but only to focus application of this term on the agency and not the requester. *Id.*

To the extent that the plaintiff argues that the only question at issue is whether it is "technically feasible" for the defendant to make the records available to the plaintiff in electronic format, the plaintiff is mistaken. Instead, the defendant is correct that "it cannot be that 'readily reproducible' simply means technical capability or feasibility." Def.'s Mem. at 15.

A court must "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Moreover, it is a "'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994) (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986)). The phrase "technically feasible" appears elsewhere in the FOIA. *See* 5 U.S.C. § 552(a)(2)(E) ("If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made."); 5 U.S.C. § 552(b) ("If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made."). In order to give "every clause and word of a statute" meaning, the phrase "readily reproducible" cannot share the same meaning as the different phrase "technically feasible." *See Union of Concerned Scientists v. U.S.*

*Nuclear Regulatory Comm'n*, 824 F.2d 108, 115 (D.C. Cir. 1987) (holding that, where Congress has expressly referred to specific standards in other statutes "it knew how to say so" in the instant statute); *see also Massachusetts v. EPA*, 549 U.S. 497, 537 (2007) (Roberts, C.J. dissenting) (noting that Congress' express use of particular phrasing elsewhere in a statute indicates Congress' intent to convey different intent when using different phrasing).

The plaintiff is partially correct that the common sense meaning of the word "reproducible," standing alone, is synonymous with "technically feasible," yet, just because an agency has the technical capability to reproduce responsive records in the requested format, the agency is not automatically obligated to do so under 5 U.S.C. § 552(a)(3)(B). That obligation turns on the meaning of the full term "readily reproducible." The defendant argues, based on the definition of "readily" found in the Oxford English Dictionary, that Congress only intended agencies to have to comply with this subsection when doing so could be accomplished "without much difficulty" or "easily." Def.'s Reply at 3. The defendant, too, is partially correct in that "readily" does imply that an agency is relieved of its obligation to fulfill a format request that is onerous, but the defendant ignores the second sentence in 5 U.S.C. § 552(a)(3)(B), which informs the meaning of "readily" in the first sentence of this subsection: "Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section." In order to "give effect," as the Court must, to this second sentence, *see Duncan*, 533 U.S. at 174, the statute must be read as requiring an agency to take affirmative steps toward maintaining records in "reproducible" formats such that they are "readily reproducible" when sought out by FOIA requesters. It is in disregarding the full meaning of this second sentence, when read in conjunction with the first, that the defendant errs.

### 2. Records Need Not Exist In The Exact Format Requested In Order To Be "Readily Reproducible"

The defendant's definition of "readily reproducible" is based on the notion that in order to fulfill its statutory mandate under 5 U.S.C. § 552(a)(3)(B), an agency need only honor requester's chosen formats when they are "choos[ing] among the formats in which the record already exists." Def.'s Mem. at 9. This cramped reading of the FOIA's legal requirement is not supported by its plain language, nor has it been interpreted as such. As noted, the subsection consists of two distinct sentences. The first sentence describes the reactive duty of the agency: "an agency shall provide the record [requested] in *any* form or format requested by the person if the record is readily reproducible by the agency in *that form or format*." 5 U.S.C. 552(a)(3)(B) (emphasis added). The Supreme Court has "recognized that the modifier 'any' can mean 'different things depending upon the setting,'" *Christopher v. SmithKline Beecham Corp*., 132 S. Ct. 2156, 2170-2171 (2012) (quoting *Nixon v. Missouri Muni. League*, 541 U. S. 125, 132 (2004)), but generally "has an 'expansive meaning,'" that "can broaden to the maximum, but never change in the least, the clear meaning of the phrase selected by Congress here," *Freeman v. Quicken Loans, Inc*., 132 S. Ct. 2034, 2042 (2012) (internal quotation marks omitted). The use of the word "any" to modify the form or format requested must therefore be given an "expansive" reading, subject only to whatever limitation Congress imposed in the statute. Here, agencies "shall" provide responsive records in requested forms or formats, so long as the agency is able to readily reproduce the responsive record in the form or format requested. 5 U.S.C. § 552(a)(3)(B). Contrary to the defendant's construction of this requirement, this requirement applies without regard to the form or format in which the agency maintains the record.

The second sentence amplifies the importance of the requirement set out in the first sentence and imposes an over-arching obligation on federal agencies to be proactive in satisfying

format requests: "Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section." *Id.* Thus, the second sentence requires an agency to take affirmative steps to maintain its records in a form that would be readily reproducible in response to FOIA requests for "any form or format." The defendant's position that this subsection limits an agency's obligation to honor format requests to only existing formats ignores the plain statutory text in the subsection's first sentence as well as the proactive admonition in the subsection's second sentence.

The flaw in the defendant's reading of 5 U.S.C. § 552(a)(3)(B) is further demonstrated by the absurdity of its result. For example, if an agency kept non-exempt e-mail communications only in electronic format, and a requester sought those records in paper form, the agency would, according to the defendant's logic, be permitted to deny production in paper form merely because the records were not stored on paper and its obligation to provide records in the requested format extended only to records already existing in that format. That is not the law. If the records are "readily reproducible" in the requested format, the agency must honor the request.

In positing its interpretation of the 5 U.S.C. § 552(a)(3)(B) requirement, the defendant relies on a quotation from a Department of Justice ("DOJ") "FOIA Update" from 1997 that clearly is not binding on this Court and is twisted out of context. *See* Def.'s Mem. at 9. Specifically, the defendant quotes from a 1997 question and answer document issued by the DOJ stating that "a FOIA requester may choose among existing forms or formats of a record, so long as the record is 'readily reproducible' in the chosen form." Def.'s Mem. at 9 (quoting U.S. Dep't of Justice, *FOIA Update*, Vol. XVIII, No. 1 (1997) *available at* www.justice.gov/oip/foia_updates/Vol_SVIII_1/page3.htm ("1997 FOIA Update")). The

defendant infers from this language that a requester may *only* choose from among existing forms or formats in which the agency maintains the record. The defendant omits critical context for the quoted DOJ guidance since the quotation is extracted from an "answer" to a question that is limited in scope to a request for existing formats. 1997 FOIA Update (posing question "If an agency maintains a record in more than one form or format, can a FOIA requester now choose the one in which it will be disclosed?"). Contrary to the defendant's interpretation, the DOJ guidance goes on to make clear that an agency is obliged "to disclose a record in a new form or format" when asked to do so by a FOIA requester "if the record is 'readily reproducible' in that form or format with 'reasonable efforts.'" *Id.* (citing, *inter alia*, H.R. Rep. No. 104-795, at 18 (1996) ("House Report") ("Agencies must make a 'reasonable effort' to comply with requests to furnish records in other formats.")).[9]

In addition to being erroneous, the defendant's argument that format requests need only be honored when responsive records are maintained in the requested format is a non-sequitur because the defendant does not dispute here that the responsive records are maintained in the electronic format requested by the plaintiff. *See* Pl.'s Ex. A at 2–4; 1st Scudder Decl. ¶ 10 (alleging that *SII* articles subject to instant FOIA requests already exist in electronic PDF form). Thus, even under the defendant's erroneous interpretation of 5 U.S.C. § 552(a)(3)(B), it would not be relieved of the obligation to honor the electronic format requested. Indeed, another part of the same "answer" from the 1997 FOIA Update cited by the defendant provides clear DOJ

---

[9] The DOJ's guidance in 1997 was consistent with earlier advice provided shortly after the passage of the E-FOIA Amendments that 5 U.S.C. § 552(a)(3)(B) "require[s] agencies to honor a requester's specified choice among existing forms of a requested record (assuming no exceptional difficulty in reproducing an existing record form) and to make 'reasonable efforts' to disclose a record in a different form or format when that is requested and the record is 'readily reproducible' in that new form or format." U.S. Dep't of Justice, *FOIA Update*, Vol. XVII, No. 4 (1996), *available at* www.justice.gov/oip/foia_updates/Vol_XVII_4/page1.htm ("1996 FOIA Update"). Thus, even in 1996, the DOJ's guidance did not restrict format requests to the format in which the responsive records were maintained within an agency, as the defendant contends in this case. The defendant also cites the Justice Department's Office of Information Policy, Guide to the Freedom of Information Act (2009 ed.) at 92, which merely repeats the language of the 1996 guidance. *See* Def.'s Mem. at 9.

guidance on an agency's obligations in this exact circumstance. The DOJ's answer to the question: "If an agency maintains a record in more than one form or format, can a FOIA requester now choose the one in which it will be disclosed?" is clear, stating "Yes, with only limited exception." 1997 FOIA Update. The guidance goes on to state that "[i]n almost all cases, an agency will be able to readily reproduce any existing form or format of a record for which a requester expresses a preference." *Id.* (citing 1996 FOIA Update). The DOJ reiterated this guidance in 1998, noting that "whenever an agency already maintains a record in more than one form or format, the requester can choose the one in which it will be disclosed" and calling any exception to this rule a "highly unusual case." U.S. Dep't of Justice, *FOIA Update*, Vol. XIX, No. 1 (1998), *available at* www.justice.gov/oip/foia_updates/Vol_XIX_1/xixpage4.htm ("1998 FOIA Update"). Notably, the DOJ's guidance is entirely consistent with reading the two sentences of 5 U.S.C. § 552(a)(3)(B) in conjunction, with the "reasonable efforts" standard informing the definition of "readily reproducible."

The defendant's characterization of its own blanket inability to "readily reproduce records requested under the FOIA . . . in an unclassified electronic format" is difficult to reconcile with the DOJ's repeated and express guidance that, when an agency maintains a record in a particular format, it will be "a highly unusual case" or "only limited exception" when the record cannot be readily reproduced by the agency in that format. *See* 1997 and 1998 FOIA Updates. Insofar as the defendant has self-assessed its own capabilities and capacity, *every* request to the defendant for electronic records apparently falls within the DOJ's exception for the "highly unusual case" where the record cannot be readily reproduced, despite the clear expectation that agencies generally would have no such trouble complying with electronic format requests for records already maintained in the electronic format requested.

In addition to DOJ guidance documents, the defendant relies on two district court cases, *Landmark*, 272 F. Supp. 2d at 63, and *Carlson*, 2005 WL 756573, at *7, for the proposition that it need not produce the requested records in electronic format. *See* Def.'s Mem. at 9–10. These two cases do not support the weight of the defendant's argument. In *Landmark*, the plaintiff sought copies of agency e-mails that no longer existed in electronic format, but paper copies were maintained in de-centralized folders "filed according to relevance." *See Landmark*, 272 F. Supp. 2d at 63. The *Landmark* court held that "FOIA does not require an agency to reorganize its files in anticipation of or in response to a FOIA request," and that failure to maintain an electronic database of the requested records was not a violation of the "readily reproducible" subsection of the FOIA, 5 U.S.C. § 552(a)(3)(B). *Id.* The *Landmark* court's discussion of whether the agency was required to maintain records in electronic format arose in the context of the plaintiff's challenge to the timeliness of the agency's search and production. *Id.* There is no indication that the plaintiff in that case requested production of records in electronic format and, consequently, the *Landmark* court never addressed the agency's obligation to honor format requests. *Id.*

By contrast to the situation in *Landmark*, the plaintiff here has requested release of responsive records in electronic format and has provided reasonable evidence, based on his purported personal experience and observations, that the documents requested *do* exist in the format requested. Indeed, in his FOIA requests, the plaintiff even alerted the defendant's FOIA staff as to where within the defendant's computer systems the electronically stored documents are located. *See* Pl.'s Ex. A at 2–4. The plaintiff here is not asking the defendant to "reorganize its files" but instead to provide an electronic copy of the requested records in a form already maintained by the defendant. *See id.* Thus, *Landmark* cuts against the defendant and lends

support to the plaintiff's argument that the requested articles are readily reproducible in electronic format, since they currently exist and are stored in that format. *See Landmark*, 272 F. Supp. 2d at 63.

*Carlson* addressed whether an agency had to honor a plaintiff's request for aggregate data in an electronic format when the individual pieces of data to be aggregated were already publicly accessible. *See* 2005 WL 756573, at *7. The issue of whether the documents were "readily reproducible" was addressed only obliquely, since the defendant was withholding the data requested under the so-called "High 2 exemption," *id.*, which has since been rejected by the Supreme Court. *See Milner v. U.S. Dep't of Navy*, 131 S. Ct. 1259, 1271 (2011). The *Carlson* court ordered the agency to produce the requested records in aggregate form since the records existed electronically and could be compiled in the aggregate. *See* 2005 WL 756573, at *7. Consequently, *Carlson*, like *Landmark*, undercuts the defendant's position since the *Carlson* court found that if an agency maintained records in an electronic form, even if such records were only for internal agency use, they must be produced in an electronic form pursuant to a FOIA request. *See id*.

In sum, the defendant is incorrect that an agency need only produce records in a particular format requested if the agency already keeps its records in that format. The plain language of 5 U.S.C § 552(a)(3)(B), as confirmed by the DOJ's guidance to agencies regarding compliance with this subsection, requires agencies to provide records in requested formats, which are "readily reproducible" for the agency, whether or not the record is maintained by the agency in that format. The DOJ opined, as common sense dictates, that when the requested format is an existing format for responsive records within the agency, it would be a "highly unusual" case where the records would not thereby be "readily reproducible." When the

requester seeks production of responsive records in a format that is different from that in which the records are maintained, the "readily reproducible" requirement still applies and is informed by the second sentence of the subsection, directing the agency to engage in "reasonable efforts" to comply.[10]

*       *       *

In sum, "readily reproducible" is not, as the plaintiff contends, synonymous with "technical feasible." The Court may consider the burden on the defendant in determining whether the documents at issue are "readily reproducible" in the format the plaintiff requests. Nevertheless, the defendant is incorrect when it asserts that the Court must acquiesce to the defendant's determination as to what is "readily reproducible." Rather, the Court must consider the evidence presented by the parties and determine if, read in light of the opposing party's evidence, either party is entitled to summary judgment because there are no material facts in dispute.

## C.     Material Facts Disputed By The Parties

The evidence submitted with the cross-motions for summary judgment consists of affidavits and exhibits from each party. In multiple instances, as detailed below, the affidavits from the parties directly contradict each other. The defendant asserts, relying upon a different subsection of the FOIA, 5 U.S.C. § 552(a)(4)(B), that its declarations "are accorded a presumption of good faith and, in this instance, are entitled to 'substantial weight.'" Def.'s Reply at 10. The defendant also argues that the plaintiff's declarations should be "accorded no

---

[10] The legislative history provides some indication of the level of effort that would be viewed as "reasonable" to satisfy an agency's obligation to honor new format requests. For example, Senator Leahy, the bill's primary sponsor in the Senate, set out his views in a supplement to the Senate Committee on the Judiciary Report, S.R. No. 104-272 (1996) ("Senate Report") on the E-FOIA Amendments, stating that "[w]hen requesters seek to have data retrieved according to specifications other than those normally used by agencies for data retrieval . . . agencies should comply with such request where they can reasonably and efficiently do so. We recognize that this requirement . . . holds some potential for compelled software creation." Senate Report at 28.

weight," and argues that the "plaintiff's declarations are based on conjecture, hearsay and uninformed opinion." *Id.* Before turning to an examination of the substantial factual issues in this case, it is first necessary to address the subsection relied upon by the defendant to argue that the plaintiff's evidence should be discounted, if not rejected entirely.

1. ***The Plaintiff Has Submitted Sufficient Evidence To Overcome The "Substantial Weight" Accorded To The Defendant's Affidavits***

While "the 'readily reproducible' analysis involves the significance of the burden the requested format would impose on the agency," Def.'s Mem. at 10, the defendant overreaches in construing 5 U.S.C. § 552(a)(4)(B) to dictate that an agency's evaluation of that burden automatically trumps contrary credible evidence, *see* Def.'s Reply at 10. The subsection at issue, 5 U.S.C. § 552(a)(4)(B), requires that "[i]n addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to . . . reproducibility under paragraph (3)(B)." This subsection plainly instructs that substantial deference is due an agency's "reproducibility" determination, but such deference does not amount to a blanket exemption from judicial review of the agency's justification for declining to comply with a specific format request or failing to maintain records in readily reproducible formats, as required under the first and second sentences of 5 U.S.C. § 552(a)(3)(B). The House Report supports this interpretation, stating that "[a]gencies must make a 'reasonable effort' to comply with requests [for records] in other formats" than the format kept by agency in ordinary course. House Report at 18. Thus, the Court must evaluate the defendant's determination of whether the instant records are "readily reproducible" in light of the "reasonable efforts" requirement.

The defendant appears to be arguing that it is simply incapable of complying with this statutory mandate because of "the significant security measures in place at [the defendant]

designed to protect classified material."  Def.'s Reply at 1.  The defendant explains that its

"officers conduct their day-to-day work" on the defendant's classified network, 1st Lutz Decl.

¶ 7, and somehow, because of this fact, the release of electronic records would be "prohibitively

time consuming and costly," *id.* ¶ 5.  In other words, the defendant's position is that records are

never "readily reproducible" in electronic format for this agency.  The D.C. Circuit has explicitly

stated that, with certain limited exceptions clearly delineated in the FOIA, "the CIA . . . is

otherwise subject to the requirements of the FOIA."  *Military Audit Project v. Casey*, 656 F.2d

724, 736 n.39 (D.C. Cir. 1981).  The defendant's position is difficult, if not impossible, to

reconcile with the statutory language of 5 U.S.C. § 552(a)(3)(B), particularly since the defendant

itself created the security procedures it now says make the production of documents in electronic

format "prohibitively time consuming and costly."  *See* 1st Lutz Decl. ¶ 5.

Although the defendant is correct that 5 U.S.C. § 552(a)(4)(B) requires courts to defer to

agencies' determinations of their own technical capabilities and the burden placed on them in

complying with requests for documents in specific formats, "such deference 'is not equivalent to

acquiescence,' and even declarations invoking national security must provide a basis for the

FOIA requester to contest, and the court to decide, the validity of the withholding."  *Coldiron v.

U.S. Dep't of Justice*, 310 F. Supp. 2d 44, 49 (D.D.C. 2004) (quoting *Campbell v. U.S. Dep't of

Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998)).  This is particularly true when there are allegations of

bad faith lodged against the government or substantial contrary evidence in the record.  *See, e.g.*,

*Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011);

*Campbell*, 164 F.3d at 30; *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009) (quoting *Military

Audit Project*, 656 F.2d at 738).

"'[A] mere assertion of bad faith is not sufficient to overcome a motion for summary judgment,'" *Wiesner v. FBI*, 577 F. Supp. 2d 450, 458 (D.D.C. 2008) (quoting *Assassination Archives & Research Ctr. v. CIA*, 177 F. Supp. 2d 1, 8 (D.D.C. 2001)), but in the instant matter, the plaintiff has provided more than mere speculative assertions. The plaintiff has, for example, alleged that he has personally used the defendant's classified system to create a PDF file, something the defendant has stated is impossible. *Compare* 2d Scudder Decl. ¶ 21 ("Contrary to [the defendant's declarant's] claim, this capability does exist in the CIA desktop environment that CADRE sits on and any user can utilize it to send a document from CADRE to a PDF file stored in a location chosen by the CADRE user. In fact, I have used this capability to generate PDF files form [sic] CADRE documents and I verified the universality of this application as recently as July 21, 2013.") *with* 1st Lutz Decl. ¶ 15 ("By design, CADRE does not have a function to transfer or convert records contained in the system in the form of a PDF.").

Additionally, based on his purported personal experience with the defendant's IT systems, the plaintiff argues that the defendant has made "unquestionably . . . inaccurate statement[s]" to the Court in its affidavits regarding the technical capabilities of the defendant's systems, Pl.'s Mem. at 8, and that the defendant's characterization of its data transfer process "raises serious questions as to whether [the defendant's] statements to this Court are completely disingenuous," *id.* at 9. Moreover, the plaintiff has submitted additional sworn declarations that challenge the defendant's claims that "[d]ue to the unique security environment in which the [defendant] operates . . . records are not 'readily reproducible' by the [defendant] in an electronic format." Def.'s Mem. at 4. The plaintiff has submitted a declaration from attorney Scott Hodes, who has defended FOIA lawsuits for the government and prosecuted them for private plaintiffs since 1991. *See* Decl. of Scott Hodes, Esq. ("Hodes Decl.") ¶ 2, ECF No. 9-9. The plaintiff's

declarant states that in the course of "request[ing] hundreds of thousands of pages of records through FOIA, especially from law enforcement and intelligence agencies . . . not one federal agency – including many intelligence agencies whose very work is inherently classified – voiced any objection or refused to release records, with any classified information redacted of course, in an electronic format." *Id.* ¶ 7. Taken as a whole, the plaintiff's serious allegations challenging the accuracy and veracity of the defendant's declarations have raised sufficient concern to overcome the "substantial weight" this Court must afford the defendant's declarations under 5 U.S.C. § 552(a)(4)(B).[11]

The plaintiff aptly describes the instant dispute as having "now literally come down to 'He said vs. She said.'" Pl.'s Reply at 7. The plaintiff challenges the accuracy of the defendant's description of "the manner in which Agency documents (which all reside on the classified or 'high side' [of the defendant's computer network]) are transferred to an unclassified medium for public release." 2d Lutz Decl. Ex. A ("Production Chart") at 1, ECF No. 29-1. To facilitate review of the defendant's processing of responsive records for release to FOIA requesters, and bolster its contention that honoring electronic format requests is both technically infeasible and overly burdensome, the defendant has submitted a Production Chart. *Id.*

---

[11] The defendant relies on *Center for National Security Studies v. U.S. Department of Justice* ("*NSS*"), 331 F.3d 918, 926–27 (D.C. Cir. 2003), as support for its assertion that the Court must defer to its determination as to whether the requested records are readily reproducible because "security measures figure[] so heavily in the [defendant's] determination." Def.'s Mem. at 13. *NSS* is inapposite. In that case, the court found that in the context of a terrorism investigation, it was "unwise to undertake searching judicial review" and that the courts had "consistently deferred to executive affidavits predicting harm to the national security." *NSS*, 331 F.3d at 927. In the instant case, the defendant has laid out its procedure for processing records in detail and has not asserted that the disclosure of the *process* is a threat to national security. Moreover, "[m]any of the *Studies in Intelligence* articles requested by plaintiff are available on the [defendant's] public website," 1st Lutz Decl. ¶ 7 n.2, raising the obvious and significant question of whether and to what extent release of the requested records would implicate national security concerns. Thus, while the defendant is undoubtedly correct that courts must defer to agency determinations when national security concerns exist, the plaintiff is not challenging the defendant's assertion that "the nature of the [defendant's] intelligence mission dictates that its work be conducted behind a classified wall." Def.'s Reply at 9. Rather, the plaintiff is challenging the defendant's assertions about when and how information subject to the FOIA can be removed from behind that wall and released to the public in the format the plaintiff requests, as required by 5 U.S.C. § 552(a)(3)(B).

Summarized below are the steps described by the defendant as necessary to fulfill the plaintiff's request for the electronic versions of the *SII* articles as they are maintained by the defendant.

**Step 1**: *Locating Records*.  Responsive documents, like all of the defendant's documents that do not exist solely in paper form, exist on the classified network. Production Chart at 1.

**Step 2**: *Moving Records*.  Responsive documents, whether or not the documents themselves are classified or unclassified, must be uploaded into CADRE, which "resides on," or is a component of, the defendant's classified computer network. *Id.*  "Certain file formats of electronic documents can be directly transferred from the classified system into CADRE as opposed to having to be printed and then uploaded into CADRE." *Id*.

**Step 3**:  *Printing Records to Paper*.  If the electronic records cannot be directly transferred, "custodians or IMS staff must print the records." *Id.*  According to the defendant, the format of the responsive records in this case precludes their direct transfer into CADRE, requiring that this printing step occur.

**Step 4:** *Scanning Records to Electronic format*.  Once printed in paper form, the defendant's employees must "then scan [the printed documents] (using classified scanners) into a file format that can be accepted by CADRE." *Id*.

**Step 5**: *Moving Records*.  After scanning the printed documents, they are uploaded into the CADRE system on the classified system, whether or not the documents themselves are classified or unclassified.  *Id.*

**Step 6**: *Reviewing Records.*  Once the documents are in CADRE, on the classified system, "IMS personnel review and process the documents in CADRE applying redactions and exemption markings to each of the records at issue." *Id.*

**Step 7**: *Printing Records to Paper.*  The records are physically printed, presumably with any redactions or exemption markings, from CADRE on to paper. *Id.*

**Step 8**: *Reviewing Records.*  The physical paper copies are "visually inspected." *Id.*  The defendant does not specify who—or how many people—conduct this visual inspection.

**Step 9**:  *Scanning Records to Electronic format.*  The paper copies are "scanned (using classified scanners) into another program residing on the classified system." *Id.*[12]

**Step 10**: *Moving Records.*  "The scanned records are sent to a Data Transfer Officer (DTO)." *Id.*

**Step 11**: *Reviewing Records.*  "The DTO conducts multiple scans to check whether any classified content or metadata are embedded in the record," a process the defendant's declarant states "can take hours to complete due to the nature of the screening program and the backlog of other requests." *Id.* at 1–2.

**Step 12**:  *Reviewing Records.*  "If questions regarding content arise during the process, the DTOs require that the personnel who requested the DTO transfer certify that the data or content identified as suspect is not classified before proceeding with the transfer." *Id.* at 2.

---

[12] The defendant does not specify what this program is, though, based on the plaintiff's declarations, it is possible that this is the automated "software program [that] was developed to transfer and write data without spilling, changing files, or adding or deleting anything from the transferred data."  1st Scudder Decl. ¶ 16.

**Step 13**: *Moving Records.* "The DTO transfers the 'cleaned' or 'sanitized' records onto CD-ROM (or some other unclassified medium)." *Id.*

**Step 14**: *Reviewing Records.* The defendant's IMS personnel, who are apparently not part of the DTO process, "open each document on the CD-ROM and review its metadata and content to ensure that not [sic] classified material has been deliberately reinserted into electronic records during the DTO process." *Id.* The defendant's declarant states this would need to be done for "each of the 19,000 pages of documents requested by plaintiff," *id.*, though it is now unclear how many pages remain at issue given the plaintiff's significant narrowing of the requested records, *see supra* note 1.

**Step 15**: *Releasing Records.* The CD is sent to the requester. *Id.*[13]

Under this Rube-Goldbergian process, the same document, even if unclassified, must be printed from the defendant's classified system in paper form at least twice, at Steps 3 and 7, and rescanned into the same classified system at least twice, at Steps 4 and 9.[14] Every page of every electronic document is physically opened by at least two different employees of the defendant, at Steps 11 and Step 14, in addition to the visual inspection performed at Step 8 and the potential certification inspection at Step 12. The final reviewer, at Step 14, apparently ensures that none

---

[13] The defendant avers that it must "minimize the risk that sensitive national security secrets will be disseminated beyond those Agency personnel who have a need to know," 2d Lutz Decl. ¶ 7, but nonetheless has created a system for responding to FOIA requests that involves 15 steps, each of which may be accomplished by a different employee. *See also Nat'l Security Counselors v. CIA*, Nos. 11-443, 11-444, 11-445, 2013 WL 4111616, at *82 n.78 (D.D.C. Aug. 15, 2013) ("It would presumably minimize the risk of error (and the risk of releasing classified information) by limiting the number of people who handle releasable information, yet the [agency] appears to do just the opposite.").

[14] Although absent from the Production Chart, the defendant's declarant in another case pending before this Court, indicates that there may be another round of printing and scanning to which requested records would be subjected. *See* Part III.C.3.g, *infra*. If so, the defendant's process involves printing and scanning the same documents three times before they may be transferred onto unclassified media for release.

of the preceding reviewers, at Step 6, Step 8, Step 11, or Step 12, "deliberately reinserted" classified material into the electronic records.

The plaintiff raises at least nine issues of material fact about this process. The Court addresses the factual disputes as they relate to the defendant's position that complying with the plaintiff's format request is both technically infeasible and overly burdensome.

### 2. *Technical Feasibility*

At the outset, the defendant disputes the plaintiff's contention that production of the requested documents in the requested format is technically possible. This dispute involves two issues of material fact.

### a) *Whether The Defendant's System Technically Can Produce The Documents in the Requested Format*

The defendant states it is not technically possible for the defendant to produce the requested documents in the requested electronic format due to the classified nature of the system on which the files in question resided. *See* 1st Lutz Decl. ¶ 15 ("By design, CADRE does not have a function to transfer or convert records contained in the system in the form of a PDF."). The plaintiff directly disputes this assertion, stating that "[c]ontrary to Ms. Lutz's claim, this capability does exist in the CIA desktop environment that CADRE sits on and any user can utilize it to send a document from CADRE to a PDF file stored in a location chosen by the CADRE user. In fact, I have used this capability to generate PDF files form [sic] CADRE documents and I verified the universality of this application as recently as July 21, 2013." *See* 2d Scudder Decl. ¶ 21. Indeed, the plaintiff even went so far as to "personally verif[y]" his claim "with the CACI consultants [the defendant] uses to run the system and learned they have already tested this capability for the simple reason that [the defendant] is not the only government agency that uses CADRE." *Id.* ¶ 22.

The defendant has offered no riposte to the plaintiff in its reply or supplemental briefing, except to state that while "other government agencies may use the same platform as that upon which CADRE is built, the [defendant's] system is customized to the needs of the Agency and is very different from the applications used by the release programs of other federal agencies." 2d Lutz Decl. ¶ 4. Whether the defendant's claimed technical infeasibility is due the defendant's implementation of the CADRE system in its network environment or the defendant's choice of production process is unclear. While the former may qualify as a technical infeasibility, as the defendant claims, the latter would not.

*b)* *Whether The Requested Documents Already Exist In PDF Format*

The defendant has remained silent about the plaintiff's allegation that the requested records already exist in PDF format. *See* 1st Scudder Decl. ¶ 10. This is of particular relevance, since if the records already exist as PDFs on the defendant's system and therefore, in the normal course, would require no conversion to a different format to comply with the plaintiff's format request, the records should be plainly "readily reproducible." *See* 1998 FOIA Update ("[A] requester's choice among existing forms or formats must be honored, as a new general rule, unless there would be exceptional practical difficulty in doing so") (citing 1997 FOIA Update at 2); *cf. Chamberlain v. U.S. Dep't of Justice*, 957 F. Supp. 292, 296 (D.D.C. 1997) (involving "visicorder charts" too fragile to be photocopied without damage)). A FOIA request for records in an existing format should not be frustrated due to the agency's decision to adopt a production process that nonetheless renders release in that format highly burdensome.

**3.** *Overly Burdensome*

Closely related to whether the defendant has the technical capability of producing the responsive records in the requested format is whether doing so would impose an undue burden on the defendant. There are substantial issues of material fact, or insufficient information

39

provided, about whether the production of such records would be unduly burdensome to the defendant.

> a)      *Whether The Number Of Responsive Records Would Affect "Mission Critical" Components*

The agency's declarant indicates that providing the responsive records in an electronic format would impose a burden on the defendant's "data transfer process" to move the records from the defendant's classified system onto the unclassified system where it could be transferred to a removable media device, such as a flash drive or a DVD, for release to the plaintiff.  *See* 1st Lutz Decl. ¶¶ 8-11.  Since the defendant's classified system "is designed for transfer of discrete sets of data files for mission critical purposes," the defendant's declarant states that the defendant "does not have the resources to support massive information review and release projects."  *Id.* ¶ 11.  According to the defendant's declarant, this data transfer process employed by the agency to move electronic files from classified to unclassified systems contributes to the undue burden the plaintiff's request for electronic production of responsive records—and, apparently, every other such request—places on the defendant.  *See id.*

The Court construes the defendant's argument to be that Steps 11 and 12 of the agency's FOIA production process create a burden, when a "DTO conducts multiple scans to check whether any classified content or metadata are embedded in the record," and, "[i]f questions regarding content arise," the DTO has to check the data with the person who requested the transfer.  *See* Production Chart at 1–2.[15]  According to the defendant, this process would "take hours to complete due to the screening process and the backlog of other pending requests."  1st Lutz Decl. ¶ 11.

---

[15] In other words, the Court does not understand the defendant's declarant to be asserting that merely "dragging and dropping" responsive files at the end of the process from the defendant's systems to unclassified, removable media, as set out in Step 13 of the Production Chart, is onerous.

The plaintiff challenges the assertion and the corresponding implication that the limited number of DTOs would require the removal of an officer from a "mission critical" objective to respond to the plaintiff's request. The plaintiff asserts that the only DTOs affected would be those assigned to the defendant's FOIA staff, and transfer of responsive electronic records to unclassified media "would have absolutely no impact on the [other component's] process or anyone else's for that matter." *See* 2d Scudder Decl. ¶ 13. The defendant's declarant implicitly confirms the plaintiff's general critique by noting that "DTOs are appointed by each Directorate or independent office." 1st Lutz Decl. ¶ 10. Instead, the defendant contests the plaintiff's argument by reaffirming that because "the number of DTOs is restricted by regulation to a total of three percent or less of the workforce, their work is necessarily confined to transfers that support the [defendant's] core missions." 2d Lutz Decl. ¶ 7. The defendant's declarant may be correct, but her response does not address the core question of whether the use of one or several DTOs in the defendant's FOIA division would impede the defendant's other "mission critical" activities. This is an issue of material fact since the defendant relies in part on this characterization of the DTO process to support its contention that "[u]sing existing mechanisms to process the large volume of records requested in response to these information access programs would be prohibitively time consuming and costly." 1st Lutz Decl. ¶ 5. Therefore, this outstanding question cannot be resolved as a matter of law such that summary judgment is appropriate.

### b) *Whether The DTO Process Is Inherently Burdensome*

Related to the question raised in Part III.C.3.a, *supra*, the parties also dispute whether the DTO process itself is burdensome to the agency. For instance, the defendant asserts that the "process . . . is significantly time and resource intensive particularly when taken in combination with the additional steps needed to accommodate the security controls built into" the defendant's

classified work environment. 1st Lutz Decl. ¶ 12. The defendant appears to be referring to Steps 11 and 12 on the Production Chart. The plaintiff counters by noting that "[w]hile a DTO does run some processes on the files" to be transferred, the process "is automated. It does not 'take hours to complete due to the screening process and backlog of other pending requests.'" 2d Scudder Decl. ¶ 13. Since the defendant alleges that the labor intensive nature of the DTO process contributes to the burden of this request, exactly what DTOs actually do and whether the DTO process is actually burdensome are material facts in dispute.

c)    *Whether The Defendant's Process Is Unnecessarily Duplicative*

The defendant's declarant asserts that, even after screened materials have passed through the defendant's data transfer process, executed by specially trained and certified DTOs, "Agency personnel are required to conduct an additional security screening of content and metadata to ensure that no classified information had been inadvertently transmitted in the DTO process." 1st Lutz Decl. ¶ 13; *see also* Step 14, Production Chart at 2. This additional step, the defendant's declarant argues, "would take multiple Agency employees weeks or months to complete the transfer of the 19,000 pages of records that are responsive to [the plaintiff's] request to some form of electronic media." 1st Lutz Decl. ¶ 13.[16] The puzzle in this contention is why such an additional security screening would be avoided if the responsive records were released on paper, making production of thirty-four reams of paper in a seventy pound package preferable, in the defendant's view, to electronic production. The defendant states, without elaboration, that "there is no risk of classified data being reinserted onto a paper copy," 2d Lutz Decl. ¶ 8, but common sense would indicate it would be just as possible, if not easier, to slip classified information into

---

[16] This Court has questioned a nearly identical process in the context of a request for classified State Department documents, noting that redundant step is "completely duplicative and unnecessary." *See Nat'l Sec. Counselors*, 2013 WL 4111616, at *81-82. After denying summary judgment to the State Department on the reproducibility issue, the State Department subsequently provided all of the requested records to the plaintiff in *National Security Counselors* in electronic format. *See* 4th Decl. of Sheryl L. Walter, Director, Office of Info. Progs. and Servs., U.S. Dep't of State (Feb. 28, 2014) ¶¶ 7–9, 11, Case No. 11-445, ECF No. 59-11.

a 19,000 page printout as it would be to hide classified information in metadata associated with electronic formatted copies of the same records.

Moreover, the defendant's position appears to be predicated on the notion that its specially trained and certified DTOs cannot be fully trusted and might compromise national security by intentionally or accidentally reintroducing classified or sensitive information into the reviewed documents, such that each DTOs work must be checked by other, presumably more trustworthy or careful officers. *See* 2d Lutz Decl. ¶ 8. As the plaintiff points out, this argument would appear to negate the effectiveness of the DTO program in its entirety. *See* 2d Scudder Decl. ¶ 20 ("If Ms. Lutz's explanation were true than [sic] the entire DTO process that is regularly utilized by CIA officers every day would be inherently flawed and a security risk . . . . The [defendant] developed the DTO process to not only allow a limited and controlled way to bring data off the [classified] side, but also created a specific program that would guarantee no additional data is accidentally burned to the DVD."); *see also* Decl. of Paul Dell, Information Technology Consultant ("Dell Decl.") ¶ 5, ECF No. 21-2 ("The idea of the Agency's secure metadata being at risk due to release of documents in an electronic format is anathema to the concept of CADRE itself. Such metadata could only be available in a given release if left intact purposely by those agents responsible for vetting the documents."). This raises an issue of material fact as to whether the defendant has, as the plaintiff alleges, "intentionally created a release process through IMS that denies taxpayers their FOIA rights." 2d Scudder Decl. ¶ 20.

> d) *Whether The DTO Process Must Be Used To Fulfill The Defendant's Request*

The defendant argues that "[t]he DTO process, which as plaintiff acknowledges is a required part of transferring records from the high-side to the low-side, [] would be required for all the methods he proposes." 1st Lutz Decl. ¶ 12. The plaintiff rightfully points out that he was

not required to provide the only potential ways for the defendant to comply with his request and the proposals "were merely three of numerous examples to refute the notion that the CIA is not in a position to electronically reproduce records." 2d Scudder Decl. ¶ 17. The instant factual record is too sparse to determine whether the DTO process must be used to fulfill the defendant's request and whether the DTO process is in keeping with the statutory requirement that the defendant "make reasonable efforts to maintain records in forms or formats that are reproducible." 5 U.S.C. § 552(a)(3)(B).

To the extent the defendant argues that "the FOIA gives an agency latitude in [the] determination" of what records are "readily reproducible," and the FOIA "does not require [an agency] to undertake . . . extraordinary measures," the defendant is correct, but only to a point. Def.'s Reply at 10. Normally, a court should not second guess an agency's method by which it chooses to release responsive documents. Nevertheless, the second sentence in 5 U.S.C. § 552(a)(3)(B) is the exception to the general rule. Clearly, Congress anticipated that recalcitrant agencies would resist being responsive to requesters' format choices, and therefore required agencies to make "reasonable efforts" to maintain those records in formats that are "reproducible for the purposes of [the sub]section." 5 U.S.C. § 552(a)(3)(B). Where, as here, an agency asserts nearly twenty years after the passage of the E-FOIA Amendments that it cannot provide *any* electronic formats because of a lengthy process the agency has created, a court is required by the FOIA to evaluate that process to determine if it meets the statutory mandated "reasonable efforts" standard. The defendant ignores the substantial challenges raised by the plaintiff in the instant matter when making the blanket assertion that the "plaintiff presents no evidence to demonstrate that the [defendant] has failed to meet this obligation" under 5 U.S.C. § 552(a)(3)(B). Def.'s Reply at 9. On the contrary, the plaintiff has challenged myriad assertions

made by the defendant and, even if he had not done so, the defendant's assertion that it cannot provide electronic files would, in and of itself, trigger the "reasonable efforts" evaluation demanded by the statute. Thus, a material factual dispute exists as to whether the DTO process must be used and whether it represents a reasonable effort on behalf of the defendant to fulfill the FOIA's statutory mandate to provide records that are reasonably reproducible in the formats sought by FOIA requesters.

e)     *Whether The Requested Documents Are Already Public*

Another factual dispute exists as to whether the DTO process is necessary to fulfill most of the plaintiff's request, since the defendant's declarant asserts that the vast majority of the plaintiff's requested documents are "available on the CIA's public website and at the National Archives and Records Administration." 2d Lutz Decl. ¶ 3 n.1. In the absence of additional detail from the parties about the number of records or pages of such records that are already publicly available in electronic format, it is unclear whether the defendant was referring solely to the articles requested under FOIA Request No. F-2011-00450, which has subsequently been substantially narrowed, *see* Pl.'s Clarification at 1–2, or also refers to the articles requested under the plaintiff's two remaining FOIA requests. If the latter is true, the defendant would have no need to use the DTO process for the "1,627 . . . *Studies in Intelligence* articles" requested, since the documents already exist in an unclassified, public format, and this would clearly reduce any burden on the defendant caused by the release of the remaining requested records in electronic format. *See* 2d Lutz Decl. ¶ 3 n.1. The defendant's requirement that all FOIA processing occur on its classified network, even for unclassified records, *see, e.g.*, Production Chart Steps 1, 2, 5, and 9, *supra*, may be unnecessary in this context. In any event, given the lack of specific information provided by the defendant about the extent to which the public availability of the

requested records would reduce its burden, there is an insufficient record on which to base summary judgment.

>    *f)*    *Whether Electronic Records Have Been Provided To Other Requesters*

In addition to the arguments about whether and how the defendant might fulfill the plaintiff's request for electronic records, the plaintiff in the instant matter, similarly to the plaintiff in *TPS, Inc.*, has provided evidence that the defendant has responded to other FOIA requests with electronic records in the electronic format requested by the recipient. *See* Pl.'s Reply Ex. 3 (Correspondence from CIA to Trevor Griffey) at 4–5, ECF No. 21-3. This evidence consists of correspondence between the defendant and another FOIA requester and indicates that, contrary to the defendant's claimed incapacity and incapability here, the defendant has produced electronic records to FOIA requesters in the past. *Id.* In one communication, a representative of the defendant advises a requester that a specific file on CADRE was being delivered on a CD-ROM, stating "[y]ou requested a copy of a document, CADREREFID C00017991, which was not included on the CD-ROM sent to you on 21 December 2011. Enclosed you will find a copy of the requested document and an updated copy of the CD-ROM containing all 614 records relating to the subjects listed above." *Id.* at 5. Notably, the defendant has not explained the difference, if any, between the electronic files provided previously to the FOIA requester identified in the plaintiff's exhibit and the electronic files requested by the plaintiff. *See generally* Def.'s Reply. The Court is mindful that, in *TPS, Inc.*, the defendant's practice of providing "zipped" files to other outside entities was eventually found to be dispositive as to the need to provide "zipped" files to FOIA requesters. *See TPS, Inc.*, 330 F.3d at 1196.

>    *g)*    *Whether The Defendant's Position Is Inconsistent*

This is not the first time this Court has addressed the issue of the defendant's compliance with the requirement in 5 U.S.C.A. § 552(a)(3)(B) of disclosing responsive records in requested

electronic format.  *See Nat'l Sec. Counselors v. CIA*, Nos. 11-443, 11-444, 11-445, 2013 WL 4111616, at *79-80 (D.D.C. Aug. 15, 2013) (noting apparent inconsistency between defendant's assertion that all responsive records are kept on a classified system at the same time that the defendant also described having to upload some unclassified responsive records to the classified system for FOIA processing).  Indeed, as the plaintiff points out, *National Security Counselors* even involves "some of the same records at issue" in the instant litigation.  Pl.'s Mem. at 6.  The defendant's rationale for why it need not produce responsive records in electronic format has apparently continued to evolve.[17]

In another case, the defendant submitted an explanation titled "Additional Authority For The CIA's Position Regarding 5 U.S.C. § 552(a)(3)(B)" ("443 Additional Authority") at 2, Case No. 11-443, ECF No. 19, stating unequivocally that "the classified IT system that the [defendant] uses to process FOIA requests can print paper documents but is not able to download documents to CDs or other forms of electronic media."  The 443 Additional Authority relies on a declaration from Susan Viscuso, the Chief of the Public Information Programs Division in the defendant's IMS division, *see id.*; Decl. of Susan Viscuso, Chief, Public Information Programs Division, IMS, CIA ("1st Viscuso Decl.") (Dec. 13, 2011) ¶ 1, Case No. 11-443, ECF No. 19-1, in which the declarant states that "responsive FOIA information cannot simply be downloaded from the classified system to a CD," 1st Viscuso Decl. ¶ 6.  This assertion is belied by the declarations in this matter from the same defendant, stating it is possible to download documents from the defendant's classified system to a CD, so long as the download is performed by a DTO.  *See* 1st Lutz Decl. ¶¶ 10–11.

---

[17] In its most recent declaration in *National Security Counselors*, the defendant's declarant has explained the defendants' process in language nearly identical to that used in the declarations filed in this matter.  *See* Decl. of Martha M. Lutz, Chief, Litigation Support Unit, CIA (March 4, 2014) ¶¶ 34–47, Case No. 11-445, ECF No. 59-1.

The 1st Viscuso Declaration also describes a step in the process of providing electronic records in response to FOIA requests that does not appear on the Production Chart submitted in this case. Specifically, the 1st Viscuso Declaration states that "[i]n order to produce the documents [requested] in an electronic format, [1] CIA FOIA analysts would have been required to extract the responsive documents from the electronic FOIA processing tool," which is apparently a reference to CADRE, which exists on the defendant's classified system. 1st Viscuso Decl. ¶ 7. This step does not appear on the Production Chart, unless it coincides with Step 7, which requires the printing of any responsive records, post-redaction, from CADRE. The 1st Viscuso Declaration goes on to state that [2] "[t]he FOIA analyst would have also had to manually conduct a quality control review to make certain that all appropriate documents had been properly extracted and were ready for review," requiring "the analyst to open each document to perform a page by page review and open each accompanying metadata file ensuring that no classified data has been extracted." *Id.* This process does not appear to correlate with any step in the Production Chart. Then, according to the 1st Viscuso Declaration, "[3] the DTO process would begin. *Id.* ¶ 8. The defendant does not discuss or acknowledge the discrepancies between the 1st Viscuso Declaration and the Production Chart.

Of further relevance, another declaration filed by the defendant in *National Security Counselors* asserts that "[o]ccasionally, the [defendant] receives requests for previously released information. Because the information has already been redacted and approved for release, the information is unclassified and does not go through an additional classification review." Decl. of Susan Viscuso, Chief, Pub. Info. Progs. Div., IMS, CIA (Jan. 13, 2012) ("2d Viscuso Decl.") ¶ 6 n.1, Case No. 11-443, ECF No. 21-1. The instant plaintiff's request for the previously released *SII* articles would appear to fit into this category, yet the Lutz Declarations indicate that *every*

article to be released would have to go through the screening and DTO process. *See generally* 1st Lutz Decl.; 2d Lutz Decl. The 2d Viscuso Declaration would appear to indicate that, for those records that have already been released to NARA or to the defendant's public website, there would be no need for the defendant to put the documents through any review process at all. The defendant has not specified which of the articles requested by the plaintiff are also in NARA or on the defendant's website, and how the process for releasing those records would differ, as the 2d Viscuso Declaration indicates would be the case.

The defendant does not explain the process by which unclassified, previously released documents, such as the responsive records at issue here, are provided to FOIA requesters, nor how those records are stored. They do not resolve the inconsistencies between the Viscuso Declarations and the Lutz Declarations pertaining to the procedures for producing electronic records. Rather, the defendant attempts to disavow those declarations, stating "the current position of the CIA is that expressed in the documents filed to [sic] in the instant matter by the [defendant]" and admitting only that the plaintiff accurately quoted the defendant's declarant in *National Security Counselors*. *See* Def.'s Response Pl.'s Statement of Mat. Facts About Which There Is No Genuine Issue ¶ 3, ECF No. 14-2.

*      *      *

In sum, there are substantial disputed issues of material fact and portions of the factual record that are insufficiently developed in areas ranging from the general—whether the defendant is technologically capable of providing the requested records in the requested format—to the specific—whether the DTO process must be used to fulfill the plaintiff's request and whether it is unduly burdensome. Even according the substantial weight required by the FOIA to the defendant's declarant, *see* 5 U.S.C. § 552(a)(4)(B), the declarations filed in this case

have raised some, and left unanswered other, material questions. Therefore, the Court finds that summary judgment is precluded as to both parties and, consequently, the plaintiff and defendants' motions for summary judgment on the electronic production of records are denied.

**D. Procedural Mechanisms For Resolution Of Factual Disputes**

The plaintiff requests discovery and/or an evidentiary hearing in the absence of a summary judgment ruling. *See* Pl.'s Mot. at 1; Pl.'s Reply at 6–9. The Court is well aware that "'[d]iscovery in FOIA is rare and should be denied where an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains.'" *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (quoting *Schrecker v. U.S. Dep't of Justice*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002)); *see also Cooper v. U.S. Dep't of Justice*, 890 F. Supp. 2d 55, 65 (D.D.C. 2012) (same); *Thomas v. U.S. Dep't of Health & Human Servs.*, 587 F. Supp. 2d 114, 115 n.2 (D.D.C. 2008) ("discovery is an extraordinary procedure in a FOIA action"). Yet, as the plaintiff points out, discovery is not unheard of in a FOIA action, particularly where, as here, multiple issues of material fact exist, the agency affidavits contain discrepancies or are incomplete, and both parties allege bad faith on the part of the other. *See* Pl.'s Reply at 8 (citing cases);[18] *see also Landmark Legal Found. v. EPA*, No. 12-1726, 2013 WL 4083285, at *8 (D.D.C. Aug. 14, 2013) (finding discovery warranted where plaintiff raised two issues of material fact sufficient to rebut presumption of agency good faith); *Citizens for Responsibility and Ethics in Wash. v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 56 (D.D.C. 2006) (noting "limited discovery has been allowed" in presence of evidence or wrongdoing or material conflict in agency affidavits) (citing *Long v. U.S. Dep't of Justice*, 10 F. Supp. 2d 205 (N.D.N.Y. 1998)).

---

[18] Among the FOIA cases cited by the plaintiff are *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 181 (1975) and *Cooper v. U.S. Department of the Navy*, 594 F.2d 484, 485 (5th Cir. 1979), both of which reference the fact that the district court allowed discovery. Pl.'s Reply at 8.

The defendant's objection to the plaintiff's request for discovery or a hearing rests entirely on the statutory direction in 5 U.S.C. § 552(a)(4)(B) that the agency's declarations are entitled to substantial weight. *See* Def.'s Reply at 10. As discussed in Part III.C.1, however, even substantial deference must give way in the face of disputed material facts, or at least await resolution of those facts. Contrary to the defendant's position, the plaintiff has pointed to two FOIA cases, Pl. Mem. at 11; Pl.'s Reply at 8, in which the D.C. Circuit remanded the case to the district court when summary judgment was improvidently granted without resolution of plaintiff's countervailing facts disputing the agency declarations. *See Tax Analysts v. IRS*, 214 F.3d 179, 185 (D.C. Cir. 2000) (remanding FOIA case for further discovery where a "narrow and fact-specific question" was at issue and "the present record [was] inadequate" for summary judgment purposes); *Schaffer v. Kissinger*, 505 F.2d 389, 391 (D.C. Cir. 1974) (vacating district court's grant of summary judgment in order for FOIA requester to seek discovery where a factual dispute existed about whether a document was properly classified).

Ironically, the defendant relies on *Cooper*, for the proposition that discovery is improper in this FOIA case, when the procedural history of that case demonstrates the opposite. *See* Def.'s Reply at 10. In *Cooper*, the D.C. Circuit initially remanded the case to the district court because the plaintiff had "'submitted countervailing evidence as to the adequacy'" of the agency's search, 890 F. Supp. 2d at 59 (quoting *Cooper v. DOJ*, No. 03-5172, 2004 U.S. App. LEXIS 8135 at *1 (D.C. Cir. April 23, 2004) (per curiam)), and subsequently remanded the case a second time to the district court on substantially the same ground, *id*. at 60.

The case of *Sun-Sentinel Co. v. U.S. Department of Homeland Security*, 431 F. Supp. 2d 1258, 1276 (S.D. Fla. 2006), on which the plaintiff relies, is instructive since it involved closely analogous facts to the instant case. In *Sun-Sentinel Co.*, a FOIA requester disputed a government

agency's assertion in an affidavit that certain information would not be released because to do so would "significantly interfere with [the agency's] automated information systems," such that it would "shut[] down [the agency's] entire" automated system. *Id.* at 1275. The requester in *Sun-Sentinel Co.* countered with evidence that the agency had been able to provide the requested information to another government agency without paralyzing its systems and that the agency's past practice cast doubt on the accuracy of the agency's claims. *See id.* at 1276. The court in *Sun-Sentinel Co.* found that these disputed issues were material facts that made "summary judgment inappropriate" and held that "the Court must hold an evidentiary hearing to resolve these factual issues." *Id.*

Similarly to *Sun-Sentinel Co.*, the plaintiff here has produced evidence, in the form of correspondence to another FOIA requester, *see* Pl.'s Reply Ex. 3 at 2–5, that the defendant has released records responsive to FOIA requests in an electronic format, despite the defendant's assertions that the defendant's systems are "designed for transfer of discrete sets of data files for mission critical purposes and does not have the resources to support massive information review and release projects," 1st Lutz Decl. ¶ 11. This same evidence presented by the plaintiff raises concerns under *TPS, Inc.* as to whether the defendant has a past practice of providing information in electronic format to at least some FOIA requesters, which would tend to undercut the defendant's argument that doing so here is technically infeasible and would be unduly burdensome. *See TPS, Inc.*, 330 F.3d at 1193. The courts in *Sun-Sentinel Co.* and *TPS, Inc.* both concluded that summary judgment was inappropriate and additional fact-finding was required to resolve the disputed material facts.

Additionally, the defendant has put the plaintiff's credibility at issue by challenging his claims of personal knowledge as to the defendant's systems and capabilities. *See* Def.'s Mem. at

12-13; Def.'s Reply at 6. The substantial concerns raised by the defendant about the plaintiff's credibility, by questioning his "personal knowledge of CADRE" and whether his knowledge of the CIA's systems came from "informal" interactions with systems engineers that "were not part of his job responsibilities," suggests that the material factual disputes at issue here cannot be resolved on the mere submission of additional affidavits. *See* Def.'s Reply at 6. The plaintiff has, moreover, explained in some detail the witnesses he would put forward and proffered as to what they would testify if called as witnesses at an evidentiary hearing. *See* Pl.'s Reply at 6–9; 2d Scudder Decl. ¶ 26.

The Court has previously indicated that, in the context of the fact-specific inquiry demanded by the FOIA's "readily reproducible" requirement and the defendant's heretofore inadequate declarations, "[i]t may be that these and other lingering factual questions . . . will have to be resolved in the traditional manner of resolving factual disputes in the federal judicial system—a hearing or trial." *Nat'l Sec. Counselors*, 2013 WL 4111616, at *80 n.77. It appears that time has come.

A court has a wide variety of options to resolve factual disputes, "from expansion of the record by means of affidavits and other written submissions or through discovery [and] full-blown hearings with live testimony by the movant and other witnesses." *Pham v. United States*, 317 F.3d 178, 185 (2d Cir. 2003) (Sotomayor, J., concurring). In FOIA cases, "courts generally will request that the agency supplement its supporting declarations," so as to resolve the factual disputes. *See Hall v. CIA*, 881 F. Supp. 2d 38, 73 (D.D.C. 2012) (quoting *Judicial Watch, Inc. v. U.S Dep't of Justice*, 185 F. Supp. 2d 54, 65 (D.D.C. 2002)). The plaintiff requests discovery to settle the factual issues in the instant matter. Pl.'s Reply at 7.

The Court recognizes the substantial costs in time and resources that may be incurred by both parties in the pursuit of standard discovery, such as document demands, interrogatories and depositions.  The parties may prefer to short-circuit an extensive discovery process and instead proceed directly to an evidentiary hearing to resolve the outstanding material factual disputes.  The defendant's argument that the plaintiff lacks credibility and that his testimony should be discounted also brings to mind the Supreme Court's caution that "courts must always be sensitive to the problems of making credibility determinations on the cold record."  *United States v. Raddatz*, 447 U.S. 667, 679 (1980).  Although it is possible that deposition transcripts might provide the requisite material needed to resolve the factual disputes at issue, the voluminous briefing and multiple declarations filed by the defendant in at least two cases before this Court on this very issue tends to belie that conclusion.

It may be that in light of the significant issues of material fact in the instant case and the defendant's choice to put the credibility of the plaintiff and his declarations at issue, an evidentiary hearing is unavoidable.  Nevertheless, the Court will allow the parties the opportunity to meet and confer to determine if a discovery plan that stops short of a hearing would adequately resolve the material factual disputes in the instant matter.

## IV.   CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment on the production of electronic records and the parties' motions for partial summary judgment regarding the cost of electronic records are denied without prejudice.  The plaintiff's motion in the alternative for discovery and/or an evidentiary hearing is granted.  The parties shall, by March 31, 2014, submit a joint status report outlining the results of the parties' meeting for resolving the outstanding issues of material fact, which report shall (1) provide a plan for discovery necessary to resolve

the disputed issues of material fact; (2) state the parties' views on whether an evidentiary hearing in this matter should be scheduled; and (3) a proposed schedule to control such discovery and/or hearing and renewed dispositive motion briefing.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 12, 2014

_____
BERYL A. HOWELL
United States District Judge